# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KERI EDWARDS, )<br>)<br>        **Plaintiff,** )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, Commissioner of the )<br>Social Security Administration, )<br>)<br>        **Defendant.** ) | Case No. 11-CV-102-PJC |

## OPINION AND ORDER

Claimant, Keri Edwards ("Edwards"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Edwards appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Edwards was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Edwards was 46 years old at the time of the hearing before the ALJ on May 27, 2009. (R. 24). She had some college. *Id*. She was 5' 9" tall, and at the time of the hearing weighed about 325 pounds. (R. 32). Edwards testified that her last job was as a habilitation training specialist, giving care to a developmentally disabled man. (R. 25-26). Her employer wanted her to take a lifting class in order to continue her employment, but her doctor would not give permission for

her to take that class due to back problems that she had since 1987. (R. 26). The doctors had only prescribed physical therapy, and that had made her back problems worse. (R. 33). She took pain medication that did not get rid of the pain, but made it bearable. *Id.* The medication also made Edwards sleepy. *Id.*

In addition to her back problems, she had osteoarthritis and rheumatoid arthritis in both knees, and surgery had been performed on her left knee. (R. 26). Edwards testified that the surgeon had instructed her not to walk, but to do forms of exercise such as water walking or stationary bicycle. (R. 26-27). Her knee problems caused pain and swelling, and she had fallen also. (R. 27).

Edwards also described migraine headaches that she experienced about three times a week. (R. 33). She stayed in a darkened room and took four Advil pills at a time, but the headaches lasted for 8 to 12 hours. (R. 33-34).

Edwards testified that a typical day included much less activity than her previous activity level. (R. 27). She had cut back on activities such as laundry and cooking, and her husband helped with those chores. *Id.* While she had previously showered daily, at the time of the hearing she no longer did so, because it was too painful. *Id.* She stayed in a recliner most of the time, although she had to get up periodically because she couldn't sit for very long. *Id.* She testified that she also slept in the recliner, because she had difficulty getting up off of the bed. *Id.* She could only sleep for about an hour to an hour-and-a-half at a time or she would have trouble getting up out of the recliner. (R. 28). Edwards had also been diagnosed with sleep apnea. (R. 27).

Edwards testified that she did some vacuuming, but she could only do it for about 15 minutes at a time, alternating with 15 minutes of rest. (R. 28). Her ability to cook was limited because she could not put items in or take them out of the oven, due to the bending. *Id.* She said that her hands would "freeze" around items such as a knife if she attempted to chop food. (R. 28-29). When she went grocery shopping, she would ride in the motorized cart, and she would need assistance to lift the items into the cart. (R. 29). She could not type on a keyboard, which was an activity she had previously loved to do. *Id.* She said she had surgery on her right hand which increased the amount of movement, but the hand was very sore. (R. 30-31). She had trouble getting dressed by herself, so she avoided clothes with buttons or zippers. (R. 32-33).

Edwards was seen by the emergency medicine department of Jane Phillips Medical Center on July 30, 2005, apparently for right hand injury. (R. 177-78). X-rays showed no acute fracture. *Id.*

On August 29, 2005, Edwards saw Don R. Roller, M.D. at Family Care of Tulsa with a need to have a form signed authorizing Edwards to lift at work. (R. 218-20). On examination, Dr. Roller noted mild tenderness to palpation over the left lower lumbar and upper buttock area, and straight leg raising was negative. (R. 219). His diagnosis was degenerative disc disease of the lumbar spine with radiculopathy to the left leg. *Id.* He ordered an MRI, and he instructed Edwards to hold on to the form for the time being. (R. 220). He prescribed over-the-counter Advil. *Id.*

An MRI of Edwards' lumbar spine was done on September 6, 2005, and the report stated that Edwards had experienced chronic low back pain for ten years, with occasional pain in the left hip and left foot. (R. 181). Impressions were an extruded disc herniation at L2/L3 and severe disc degeneration at the L5/S1 level with a note that the canal was "nearly stenotic." *Id.*

Edwards followed up with Dr. Roller on September 8, 2005, and he noted that DHS was requiring that Edwards be certified to lift 50 pounds. (R. 221-22).

Edwards was tested for sleep apnea at St. John Medical Center on September 24, 2005. (R. 154-56). After testing, she was diagnosed with severe obstructive sleep apnea hypopnea syndrome. (R. 156). Edwards did not tolerate the nasal mask, so it was recommended that she possibly consult with a dentist to explore whether a dental appliance could be used. *Id.* Weight loss was also recommended. *Id.*

Edwards saw Dr. Roller again on October 11, 2005, and he noted her sleep apnea evaluation and recommendations. (R. 223). Dr. Roller mentioned the DHS form requirement, but did not make any additional statements about it. (R. 223-24). He urged Edwards to work on weight loss and to continue home back exercises. *Id.*

Edwards was seen by the emergency medicine department of Jane Phillips Medical Center on April 12, 2006, apparently for chest pain. (R. 171-76).

Edwards saw Jan Williams, M.D. at Family Care of Tulsa on April 27, 2006 for a physical. (R. 226-28). She saw Dr. Williams on May 25, 2006, for follow up regarding diabetes. (R. 229-30). Edwards said she felt "better than she ever has." (R. 229). She was diagnosed with type II diabetes and with a heel spur. (R. 230). Edwards was seen at Jane Phillips Medical Center on June 20, 2006 for diabetes education. (R. 170). Edwards saw Dr. Roller on July 20, 2006, and he considered her diabetes to be controlled, and he discontinued her diabetes

medications. (R. 232-33). Edwards saw Dr. Roller on September 26, 2006 with upper respiratory infection symptoms. (R. 234-35). On examination, Dr. Roller noted some mild hypertrophy and tenderness to palpation of Edwards' ankles. (R. 235). He prescribed Mobic. *Id.* At a follow up appointment on October 19, 2006, Edwards had acute bronchitis and was given counseling in smoking cessation. (R. 236-37).

Edwards was seen again by the emergency department at Jane Phillips Medical Center on December 17, 2006 for right shoulder pain. (R. 165-69). X-rays showed no acute injury, but showed mild "acromioclavicular joint osteoarthritis." (R. 169). Edwards was seen again on January 10, 2007 for abdominal pain. (R. 157-64).

Edwards saw Jonathan Brewer M.D. at Family Care of Tulsa on January 23, 2007, and he found that her diabetes was still controlled by diet. (R. 238-39). Dr. Brewer saw Edwards again on February 12, 2007 for left knee pain. (R. 240-41). The record also includes a note that Edwards needed a form signed for work, and it states that the form was completed. (R. 240-41). Edwards was referred for an MRI. (R. 241). An MRI of Edwards' left knee was done on February 14, 2007. (R. 179-80). Impressions included tricompartmental osteoarthritis with severe changes. (R. 180). Edwards saw Dr. Brewer again on February 16, 2007 for follow up after the MRI. (R. 242-43). Edwards noted that she had fallen that day, but she did not wish to be treated for the fall. (R. 242). She was given a referral for treatment of her knee. (R. 243).

James D. Cash, M.D. conducted an initial evaluation of Edwards' left knee on February 27, 2007. (R. 205). After examination, Dr. Cash's assessment was degenerative joint disease with some preservation of her joint cartilage, but significant wear and tear of the articular and meniscal surfaces. *Id.* He noted that Edwards' use of anti-inflammatory medications, her weight loss, and her improved shoes had not given her significant pain relief, and he believed that arthroscopic debridement was required to give long-term pain benefit. *Id.* He noted that this would not make Edwards' knee "normal," and it would not give full pain relief. *Id.* Dr. Cash performed the procedure on March 7, 2007. (R. 196-97). On March 16, 2007, Dr. Cash thought Edwards was doing very well, and he said that she was "going to keep up on her exercise program." (R. 201). On April 6, 2007, Dr. Cash wrote that Edwards was doing well and had very little, if any, pain. (R. 193). He said that he encouraged Edwards to lose weight because that would slow down the deterioration of her knee's arthritic condition. *Id.* He released her from care "to return to all of her regular activities." *Id.*

Edwards saw Dr. Brewer on May 8, 2007 for a physical. (R. 245-47). Diagnoses of generalized osteoarthritis and gastroesophageal reflux disease were typed inside parentheses. (R. 246). Edwards was given samples of Celebrex, and she was instructed to lose weight through exercise and diet. (R. 247).

Edwards presented to Physicians Immediate Care on September 6, 2007 with back pain. (R. 280-82). The diagnosis appears to be thoracic muscle pain, and Lortab and Flexeril were prescribed. (R. 282).

Edwards presented to Dr. Brewer on September 11, 2007 with a chief complaint of depression and anxiety, and multiple factors were cited, including Edwards' recent loss of her job. (R. 250-51). Edwards reported insomnia and fatigue. (R. 250). Her mood was described as hyperactive, and her judgment and insight appeared to be intact. *Id.* Dr. Brewer diagnosed reactive stress, started Edwards on Effexor, and gave a referral to counseling. (R. 251).

Edwards saw Dr. Brewer for follow up on lab work on October 10, 2007, and she was diagnosed with mixed hyperlipidemia, with a continuing diagnosis of reactive stress. (R. 322-23). Her Effexor was increased. (R. 323). She returned on October 23, 2007 with a complaint of blood in stool with fatigue and nausea. (R. 324-27). She returned on November 6, 2007, reporting that she felt much improved. (R. 328-31). She was prescribed Chantix for tobacco cessation. (R. 330-31). Edwards was seen by a nurse practitioner on November 16, 2007 and diagnosed with left hip pain. (R. 332-35). Edwards was seen by Dr. Roller on November 26, 2007 for a rash. (R. 336-37).

Edwards was seen at Rapid Care of Bartlesville on December 22, 2007 with sores on her arms, back, and stomach. (R. 283-85). She was instructed to use Benadryl. (R. 285).

Edwards saw Dr. Roller on January 16, 2008 for right wrist pain radiating to the arm and shoulder. (R. 342-43). Dr. Roller diagnosed de Quervain's tenosynovitis and mixed stress disorder. (R. 343). He prescribed prednisone and a right thumb spica brace, and he changed Edwards' medication for her stress from Effexor to Cymbalta. *Id.* At a recheck on February 7, 2008, Edwards said that her left wrist hurt in a similar way. (R. 344-47). Dr. Roller continued the diagnoses from January 16, adding "onset on left now" in parentheses. (R. 346). Edwards was given a referral to Dr. Clendenin. (R. 347).

Michael B. Clendenin, M.D., with Hand Surgery, Inc. conducted an initial office evaluation of Edwards' right wrist on March 14, 2008. (R. 397). On examination, Dr. Clendenin found marked tenderness over the radial side of the wrist and other findings. *Id.* His conclusion was that Edwards had "rather severe de Quervain's tendonitis." *Id.* He did an injection into the first extensor compartment and reported that there was immediate pain relief and improved motion. *Id.* He wrote that if Edwards continued to have symptoms, surgery would be considered. *Id.*

Edwards returned to Dr. Clendenin's office on March 28, 2008, in tears and reporting extreme pain. *Id.* Dr. Clendenin recommended surgery, and it was performed on March 31, 2008. *Id.* On April 14, 2008, Dr. Clendenin wrote that Edwards had excellent motion of her thumb and wrist with marked improvement from her preoperative status. (R. 398).

Edwards presented to the emergency department of the Jane Phillips Nowata Health Center on May 1, 2008 complaining of left hip pain. (R. 356-59). An x-ray taken at that time was underexposed due to Edwards' obesity, but the reviewing physician found it to be grossly normal. (R. 359). Naprosyn was prescribed, and Edwards was discharged. (R. 358).

Edwards saw the nurse practitioner at Family Care of Tulsa on May 14, 2008 for a routine physical. (R. 365-67).

Edwards was seen by Joseph H. Koenig, M.D. at Warren Clinic on January 23, 2009 apparently as a new patient. (R. 385-88). The records and handwriting are not completely clear, but it appears that Edwards presented for a routine examination, and she also complained of swelling in her ankles, and problems in her knees and other joints. (R. 385). Edwards' history of degenerative joint disease and diabetes was noted, as was her thumb splint. *Id.* On examination, Dr. Koenig noted several findings that related to Edwards' allergic rhinitis and other conditions

not the subject of her disability claim. *Id.* He noted tenderness and reduced range of motion for Edwards' spine and extremities. (R. 386). He specifically noted decreased mobility of Edwards' left hand as well as tenderness and swelling of her left knee. *Id.* Dr. Koenig made a referral to an orthopedist for Edwards' hand pain, and he prescribed Flexeril and other medications. *Id.*

Dr. Koenig signed a form titled "Medical Source Opinion of Residual Functional Capacity" on May 6, 2009. (R. 390). On the form, he indicated that Edwards could sit and stand or walk infrequently, which the form defined as less than 2 hours in an 8-hour work day. *Id.* He circled that she could frequently lift or carry less than ten pounds. *Id.* She could only infrequently use her arms for reaching or her hands for handling. *Id.* Dr. Koenig circled "pain," in response to the form's statement that "Patient needs to rest as indicated above because of." *Id.* Dr. Koenig said that Edwards' limitations were exacerbated by her obesity. *Id.* Regarding the medical findings that supported his assessment, Dr. Koenig wrote that Edwards had hand pain, tendonitis, and arthritis, surgery had been done on her hand, and she could not grasp. *Id.* He said that Edwards had bilateral arthritis of her knees, low back pain, thoracic bank pain, herniated disc, and left sciatica that was worse when she was standing. *Id.*

A Physical Residual Functional Capacity Assessment was completed by agency nonexamining consultant Shafeek Sanbar, M.D. on December 31, 2007. (R. 301-08). Dr. Sanbar checked boxes indicating that Edwards was capable of performing work at a light exertional level. (R. 302). In the section asking for narrative explanation, Dr. Sanbar summarized Edwards' physical complaints, and he noted the sleep apnea study. (R. 302). He noted the September 2005 MRI of Edwards' lumbar spine, but he also noted treating history after the MRI. *Id.* He stated that Edwards' diabetes appeared to be controlled. *Id.* Regarding Edwards' knee pain, he noted the results of the MRI, including the surgery performed, but he also stated that she

was doing well after the surgery and was released to normal activities. (R. 303). For postural limitations, Dr. Sanbar found that Edwards could never climb ladders and could only occasionally climb stairs, balance, stoop, kneel, crouch, or crawl. *Id.* He found no other significant limitations. (R. 304-08).

## Procedural History

Edwards filed an application on August 31, 2007 for disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq*. (R. 81-85). In this application, Edwards alleged onset of disability on February 28, 2007. (R. 81). The application was denied initially and on reconsideration. (R. 46-53). A hearing before ALJ Lantz McClain was held May 27, 2009 in Tulsa, Oklahoma. (R. 21-41). By decision dated September 25, 2009, the ALJ found that Edwards was not disabled. (R. 11-20). On January 14, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability

claim. 20 C.F.R. § 404.1520.[1] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

[1]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

## Decision of the Administrative Law Judge

The ALJ found that Edwards met insured status requirements through December 31, 2012. (R. 13). At Step One, the ALJ found that Edwards had not engaged in any substantial gainful activity since her alleged onset date of February 28, 2007. *Id.* At Step Two, the ALJ found that Edwards had severe impairments of degenerative disc disease of the lumbar spine, osteoarthritis of the left knee, status post surgery, hand problems, status post surgery on the right hand, sleep apnea, and obesity. *Id.* At Step Three, the ALJ found that Edwards' impairments did not meet any Listing. *Id.*

In his RFC determination, the ALJ found that Edwards had the exertional ability to perform a range of sedentary work, with the following additional limitations:

> [N]o constant use of the hands for such repetitive tasks as keyboarding. The claimant has osteoarthritis of the left knee and degenerative disc disease of the lumbar spine and is overweight, so she should not be required to lift objects and, further, be allowed to remain seated during most of the workday. The claimant also has sleep apnea which reasonably causes fatigue; however, allowing the claimant to perform sedentary work should accommodate these problems. In addition, due to her hand problems, she should not be required to constantly do such repetitive tasks [as] keyboarding.

(R. 14). At Step Four, the ALJ found that Edwards was not capable of performing past relevant work. (R. 19). At Step Five, the ALJ found that there were jobs in significant numbers in the economy that Edwards could perform, taking into account her age, education, work experience, and RFC. (R. 19-20). Therefore, the ALJ found that Edwards was not disabled from February 28, 2007 through the date of his decision. (R. 20).

**Review**

While Edwards raises numerous issues on appeal, the Court finds that the ALJ's decision must be reversed because the hypothetical propounded to the vocational expert (the "VE") did not match the RFC determination of the ALJ. Because reversal is required based on this issue, the other issues Edwards raises on appeal are not addressed.

At Step Five, the burden shifts to the Commissioner to show that there are jobs in significant numbers that the claimant can perform taking into account his age, education, work experience and RFC. *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999). The ALJ is allowed to do this through the testimony of a VE. *Id.* at 1089. The Tenth Circuit has repeatedly explained that, in order for the testimony of the VE to constitute substantial evidence supporting a Step Five finding, the hypothetical question to the VE must relate with precision all of the claimant's impairments. *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991); *Smith v. Barnhart*, 172 Fed. Appx. 795, 800 (10th Cir. 2006) (unpublished). In practice, this requirement means that the VE's testimony must be based on the "exact RFC the ALJ determined" that the claimant had. *Chuculate v. Barnhart*, 170 Fed. Appx. 583, 587-88 (10th Cir. 2006) (unpublished) (VE's omission of limited ability to use leg controls in his written response to a post-hearing hypothetical question, whether inadvertent or not, necessitated remand to verify that the VE identified jobs that the claimant could do with the exact RFC determined by the ALJ).

Here, the ALJ's RFC determination includes additional language that he did not include when eliciting the VE's testimony which the Commissioner seeks to rely upon as substantial evidence supporting the Step Five finding. In his RFC determination, the ALJ first stated that Edwards had the ability to occasionally lift and/or carry 10 pounds and frequently lift and/or carry up to 10 pounds. (R. 14). In the next sentence, the ALJ stated that Edwards "should not be required to lift objects." *Id.* The language that Edwards "should not be required to lift objects" was not in any way included in the questions asked of the VE. (R. 37-39). Because the RFC found by the ALJ was not matched with precision by the question that he asked the VE, the testimony of the VE did not constitute substantial evidence supporting the Step Five finding. *Hargis*, 945 F.2d at 1492.

The Commissioner states that the language that Edwards "should not be required to lift objects" is not a new limitation, but rather just an explanation of his previously-stated provision limiting Edwards to occasional lifting of 10 pounds and frequent lifting of up to 10 pounds. Commissioner's Brief, Dkt. #15, pp. 9-10. The Court disagrees with the Commissioner's argument, but does agree that the ALJ's RFC determination is confusing and ambiguous. As such, it is not a decision that is capable of meaningful review. *See Smith*, 172 Fed. Appx. at 800 (remand was appropriate when it was not clear what level of jobs the ALJ determined that the claimant could perform); *Hignite v. Shalala*, 25 F.3d 1057 (10th Cir. 1994) (unpublished) (decision that is internally inconsistent and self-contradictory is not capable of meaningful review).

Because the errors of the ALJ related to the lack of precision of impairments stated in the hypothetical propounded to the VE require reversal, the undersigned does not address the remaining contentions of Edwards in detail. However, the Court notes that it finds other aspects of the ALJ's decision troubling. Much of the ALJ's decision appears to be made up of "boilerplate" provisions that are predetermined language identical to language used in numerous other decisions. The use of boilerplate language in Social Security disability cases was discussed and discouraged by the Tenth Circuit in *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). The court explained that boilerplate language was a conclusion in the guise of findings, whereas the task of the ALJ is to explain the specific facts of the case before him and how those facts led him to his decision. *Id.* Boilerplate statements fail to inform the reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ considered." *Id.*

Here, the ALJ used boilerplate language in finding Edwards less than fully credible, and he then used that adverse credibility finding as a basis, using boilerplate language, for rejecting Dr. Hoenig's opinion evidence. (R. 17-19). These boilerplate provisions are identical to provisions that can be found in other cases through a simple Westlaw search.[2] The Court

---

[2] "First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." (R. 17). See substantially identical language in *Conger v. Astrue*, 2011 WL 6881902 (10th Cir.) (unpublished); *Zaricor-Ritchie v. Astrue*, 2011 WL 6243216 (10th Cir.) (unpublished); *Qualls v. Astrue*, 428 Fed. Appx. 841 (10th Cir. 2011) (unpublished); *Holcomb v. Astrue*, 389 Fed. Appx. 757 (10th Cir. 2010) (unpublished).

"Second, even if the claimant's activities of daily living were truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence . . ." (R. 17). See substantially identical language in *Qualls, supra*; *Matthews v. Astrue*, 231 Fed. Appx. 804 (10th Cir. 2007) (unpublished); *Swanson v. Barnhart*, 190 Fed. Appx. 655 (10th Cir. 2006) (unpublished).

"The claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (R. 17). See substantially identical language in *Mayberry v. Astrue*, 2012 WL 375527 (10th Cir.) (unpublished).

disapproves of the practice of cutting and pasting in boilerplate language with no actual analysis or consideration by the ALJ of the facts before him. On remand, the ALJ should consider and discuss the facts of Edwards' case and should refrain from using boilerplate provisions in his decision. In addition, on remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Edwards.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

---

"Regarding the claimant's allegations of totally disabling pain and limitations, her testimony was evaluated and compared with prior statements and other evidence." (R. 18). See substantially identical language in *Stokes v. Astrue*, 274 Fed. Appx. 675 (10th Cir. 2008) (unpublished); *Eaton v. Apfel*, 194 F.3d 1320 (10th Cir. 1999) (unpublished).

"The Administrative Law Judge gives less than great weight to the opinion of Dr. Koenig, the claimant's treating physician, as the doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." (R. 18). See substantially identical language in *Mayberry, supra; Martinez v. Astrue*, 422 Fed. Appx. 719 (10th Cir. 2011) (unpublished); *Sitsler v. Astrue*, 410 Fed. Appx. 112 (10th Cir. 2011) (unpublished).

"The course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly disabled, as the doctor has reported." (R. 18-19). See substantially identical language in *Mayberry, supra; Martinez, supra*.

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 29th day of March, 2012.

_____
Paul J. Cleary
United States Magistrate Judge